NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0516n.06

Nos. 10-2419, 10-2420

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*May 18, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **FREDRICK THOMAS FREEMAN,** | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellee/Cross-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **JAN TROMBLEY, Warden,** | ) | O P I N I O N |
| | ) | |
| Respondent-Appellant/Cross-Appellee. | ) | |

BEFORE:    MARTIN and McKEAGUE, Circuit Judges; CALDWELL, District Judge.[*]

**McKEAGUE, Circuit Judge.** Petitioner Fredrick Freeman was convicted of first-degree

murder and sentenced to life imprisonment in 1987. Ten years after the conviction was affirmed on

direct appeal in 1994, petitioner sought post-conviction relief on various grounds, which relief was

finally denied by the state courts by January 2006. Petitioner filed his habeas petition in January

2007. Although the petition would have been time-barred under 28 U.S.C. § 2244(d), the district

court determined that petitioner made a sufficient showing of actual innocence to justify equitable

tolling. Upon evaluating the merits of petitioner's claims, the district court denied several claims,

but held that petitioner had been denied effective assistance of counsel and that the prosecution had

---

[*]Honorable Karen K. Caldwell, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

engaged in misconduct. The court granted a conditional writ requiring the State of Michigan to grant Freeman a new trial.

While the district court identified the correct legal standards governing the actual innocence determination, its application of those standards to the record evidence is wanting. Because Freeman's petition is not supported by such new reliable evidence as to make it more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, we conclude that Freeman has failed to make the truly extraordinary showing required to invoke equitable tolling. It follows that Freeman's habeas petition should have been dismissed as time-barred. For the reasons more fully set forth below, the district court's order conditionally granting habeas relief is reversed.

## I. BACKGROUND

Petitioner Fredrick Freeman was convicted of murdering Scott Macklem, the fiancé of his ex-girlfriend, Crystal Merrill, in the parking lot of St. Clair Community College in Port Huron, Michigan on November 5, 1986. The instrument of death was a single shot from a shotgun. There was no witness to the murder and no physical evidence linked Freeman to the murder. Freeman's relationship with Merrill had ended when he moved from Port Huron to Escanaba, in Michigan's upper peninsula, in June 1986. The prosecution's theory was that Freeman killed Macklem out of jealousy. The prosecution's trial proofs consisted largely of Merrill's testimony about her relationship with Freeman; the contents of phone conversations Merrill had with Freeman before and after the murder; testimony of witnesses who placed Freeman at the scene at or about the time of the murder; and the testimony of Philip Joplin, a jail detainee who said Freeman admitted committing

the murder. Defendant Freeman relied on an alibi defense, calling several witnesses who testified

he was seen hundreds of miles away in Escanaba at different times on the day of the murder.

Freeman did not testify.

Some ten years after his conviction was affirmed on direct appeal in 1994, Freeman moved

for relief from judgment in the state trial court, asserting claims, *inter alia*, based on ineffective

assistance of counsel, prosecutorial misconduct, and newly discovered evidence. The state trial court

denied the motion after hearing oral arguments, but without granting Freeman's request for an

evidentiary hearing. The Michigan Court of Appeals and Supreme Court summarily denied leave

to appeal. Freeman filed his habeas petition in the Eastern District of Michigan on January 23, 2007.

The habeas petition, as later supplemented by leave of the district court, sets forth several

claims.[1] The district court correctly recognized that the petition was filed long after the one-year

period of limitation prescribed at 28 U.S.C. § 2241(d)(1) had expired. Without even conducting an

---

[1]First, Freeman contends his due process rights were violated when the state trial court denied his request for an evidentiary hearing to substantiate: (a) the impact his trial counsel's drug addiction had on counsel's performance during trial; and (b) his "gateway claim" of actual innocence. Second, Freeman contends his trial counsel afforded ineffective assistance: (a) by obstructing Freeman's exercise of his right to testify in trial; and (b) by failing to call his girlfriend, Michelle Woodworth, to testify as an alibi witness. Third, Freeman contends his appellate counsel was ineffective for having failed to assert claims that Freeman's due process rights were violated in that: (a) the jury observed him in jail garb and shackles; (b) the trial court gave an erroneous jury instruction on "reasonable doubt;" and (c) the evidence was constitutionally insufficient to sustain the verdict. Fourth, Freeman asserts a claim of prosecutorial misconduct based on charges (a) that police officers, by intimidation, deterred Michelle Woodworth from testifying for the defense; and (b) that the prosecution suppressed *Brady* material (i.e., evidence of promises made to jailhouse informant Philip Joplin to induce him to testify for the prosecution). Finally, Freeman contends the cumulative effect of all the trial errors amounted to denial of his right to a fair trial.

evidentiary hearing, however, the court concluded that Freeman was entitled to equitable tolling of

the limitation period because he had presented sufficient new evidence to undermine confidence in

the verdict. This "new" evidence Freeman presented consists of: evidence that Freeman's trial

counsel, David Dean, was addicted to drugs at the time he represented Freeman; Freeman's affidavit

attesting to the fact that Attorney Dean prevented him from testifying in his own defense; Michelle

Woodworth's affidavit attesting to the fact that she would have testified in support of Freeman's alibi

defense; and evidence that jailhouse informant Philip Joplin had recanted his trial testimony

incriminating Freeman.

The "gateway" to consideration of the merits of Freeman's habeas claims having thus been

opened by equitable tolling, the district court proceeded to address the merits. The court denied

several of Freeman's claims but determined that he was entitled to relief based on three claims.[2] The

district court granted the writ conditionally, requiring the State of Michigan to take action to afford

Freeman a new trial within ninety days. On appeal, the Warden challenges the district court's actual

innocence determination and the award of habeas relief. In his cross-appeal, Freeman challenges the

district court's denial of several of his habeas claims.

---

[2]The district court found merit in Freeman's claims: (1) that his trial counsel was ineffective for having obstructed his right to testify and for having failed to call Woodworth as an alibi witness; (2) that the prosecution engaged in misconduct by failing to correct testimony by Joplin that it should have known was false (i.e., testimony that he was not offered inducement to testify); and (3) that Freeman's appellate counsel was ineffective for having failed to assert each of the preceding meritorious claims in the direct appeal.

## II. ANALYSIS

### A. Actual Innocence

### 1. *Governing Standards*

Consideration of the merits of Freeman's petition is barred by the one-year period of limitation unless Freeman demonstrates that he is entitled to equitable tolling. "[E]quitable tolling relief should only be granted sparingly." *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (quoting *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002)). "The party seeking equitable tolling bears the burden of proving he is entitled to it." *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). Ordinarily, a petitioner is entitled to equitable tolling only if he shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, — U.S. —, 130 S.Ct. 2549, 2562 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). *See also Hall v. Warden*, 662 F.3d 745, 749-50 (6th Cir. 2011) (same).

Freeman has not even tried to meet this burden. As we shall see, in fact, substantially all the information which the district court appears to have accepted as sufficient to justify equitable tolling was anything but "newly discovered," having been available to Freeman since 1994, long before his one-year period of limitation had run on April 24, 1997. Further, the briefing includes no argument that Freeman was prevented from timely filing, nor even an explanation for his having waited until 2004 to file his state court motion for relief from judgment.

Instead, Freeman relies on alternative grounds for equitable tolling: actual innocence. A persuasive showing of actual innocence is deemed to justify equitable tolling because otherwise, a refusal to consider a habeas petition due to its untimeliness would result in a fundamental miscarriage of justice. *See Patterson v. Lafler*, 2012 WL 48186 at *3 (6th Cir. Jan. 9, 2012) (citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)). The governing standards are summarized as follows:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321.

*Souter*, 395 F.3d at 589-90 (footnote omitted). The district court's ruling is reviewed de novo. *Id.* at 584.

The district court purported to apply the above standards, but the explanation of its holding that Freeman is entitled to equitable tolling is confined to three rather obscure sentences:

> . . . The newly discovered evidence, standing alone, provides no basis for habeas relief.

However, the court finds that the evidence detailed above including the affidavits and documentation regarding defense counsel's substance abuse problem comes within the realm of newly discovered evidence and would undermine the reviewing court's confidence in the outcome of the trial. Therefore, Petitioner's habeas petition is equitably tolled, and the individual issues presented for review are not procedurally defaulted.

R. 41, Opinion and Order at 42.

This is the district court's entire "actual innocence" rationale. The court did not specifically identify the "new reliable evidence" it found significant and did not explain how the evidence amounted to the required "extraordinary" showing of Freeman's factual innocence. The only items mentioned are "the affidavits and documentation regarding defense counsel's substance abuse problem." However, the district court had carefully considered the matter of counsel's substance abuse problem and concluded there was no showing that it impacted counsel's representation of Freeman or prejudiced the defense. *Id.* at 9-14. We assume the affidavits referred to are Freeman's own affidavit (explaining that his right to testify was obstructed), Woodworth's affidavit (stating that she would have testified in support of Freeman's alibi), and the 1994 affidavit of private investigator Allen Woodside (summarizing Joplin's unsworn recantation). Yet, the district court did not affirmatively hold this evidence made it more likely than not that no reasonable juror would find Freeman guilty of Scott Macklem's murder.

In evaluating the district court's ruling, we take heed of guidance from *House v. Bell*, 547 U.S. 518 (2006). We must consider "all the evidence, old and new, incriminating and exculpatory," without regard to whether it would necessarily be admitted under rules of evidence. *Id.* at 538 (quoting *Schlup*, 513 U.S. at 331-32) (internal quotation marks omitted). Based on this total record,

the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (quoting *Schlup*, 513 U.S. at 329). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* This standard is demanding and permits review only in the "extraordinary case." *Id.* (quoting *Schlup*, 513 U.S. at 327). The petitioner's burden at the gateway stage is to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.*

This teaching highlights the deficiencies in the district court's explanation of its analysis. The district court permitted Freeman to pass through the gateway to argue the merits of his claims without first considering all the evidence and making "a probabilistic determination" that Freeman was "factually innocent"—that is, without first requiring Freeman to demonstrate that, more likely than not, no reasonable juror would have found him guilty beyond a reasonable doubt.

### 2. *New Evidence*

Still, we undertake de novo review of the record presented and may nonetheless affirm if the result is correct under the governing law. Has Freeman carried his threshold burden of adducing new reliable evidence showing his actual innocence? None of the materials Freeman cites in support of his petition are newly discovered evidence. As long as the evidence relied on was "not presented at trial," however, it may be considered "new," for purposes of showing actual innocence, irrespective of whether Freeman acted with reasonable diligence in discovering it and pursuing relief. *See Souter*, 395 F.3d at 596 n.9, 601 n.16. In *Souter*, the court expressly declined to impose

temporal limitations on the sort of evidence that may be considered "new." This understanding was recently reaffirmed in *Perkins v. McQuiggin*, 670 F.3d 665, 672-75 (6th Cir. 2012). The age of the information and the timing of its submission may be considered, though, in assessing its reliability. *See House*, 547 U.S. at 537.

The only new materials that tend to show Freeman is actually innocent of Macklem's murder—as opposed to questioning the legal sufficiency of Freeman's conviction—are not in the nature of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," as would ordinarily be required to show actual innocence. *See Schlup*, 513 U.S. at 324. Rather, they are one affidavit, signed by Michelle Woodworth in 2002, and an unsworn statement by Philip Joplin, the jailhouse informant, recounted in an investigator's 1994 affidavit. In addition, Freeman's petition includes claims of ineffective assistance of counsel based on two other "new" items. The first of these is evidence that Freeman's trial attorney David Dean had a substance abuse problem at the time of Freeman's trial. The second is Freeman's own affidavit averring that his attorney impermissibly obstructed his right to testify in his own defense. The court must consider these new items in light of all the evidence, incriminating and exculpatory, without regard to their admissibility, in determining whether, more likely than not, no reasonable juror would find Freeman guilty.

(a) *Ineffective Assistance Evidence*

The evidence of defense counsel David Dean's substance abuse consists substantially of testimony by Janice Barnum, Dean's former legal secretary and private investigator. Barnum

testified on September 13, 1991, in post-conviction proceedings stemming from a 1989 prosecution, *People v. Randy Overton*, St. Clair Cir. Ct. No. 89-1872-FC, in which Dean had represented the defendant Overton. Her testimony included her observations that Dean's abuse of alcohol, cocaine and crack had begun to noticeably affect him in 1987, and that Dean had voluntarily admitted himself to a substance abuse rehabilitation program in 1988. In the *Overton* case, moreover, Dean's substance abuse was ultimately found to have contributed to his rendering of ineffective assistance to his client.

The district court carefully considered Dean's trial performance in light of this evidence and in light of the Michigan Court of Appeals' earlier rejection of Freeman's ineffective assistance claim. The district court concluded that Freeman had failed to show that substance abuse by his attorney contributed to deficient performance that prejudiced the defense. We find no error in this assessment. As the district court observed, Dean mounted a vigorous defense on Freeman's behalf. Although Freeman, with the benefit of hindsight, continues to criticize certain strategic choices made by his attorney because they turned out to be unsuccessful, his contention that substance abuse played a role in those decisions is supported by nothing but speculation. Evidence of Dean's substance abuse, generally, at or near the time of Freeman's trial, offers no support for his gateway actual innocence claim.

The second new item advanced in support of Freeman's ineffective assistance claim that is potentially relevant to his actual innocence claim is Freeman's own affidavit, executed on September 23, 2004. In relevant part, the affidavit states:

> Affiant strongly desired to testify in his defense. Based on his conversations with Mr. Dean, he assumed he would be called to testify. However, Mr. Dean—despite affiant's protests and without his consent—declined to call affiant to the stand. When affiant wished to protest to the court his counsel's refusal to call him, the court refused to hear him, telling him he would have to address the court through his attorney. The only explanation offered affiant by Mr. Dean was that affiant had been present during the trial and would for that reason not be allowed to testify. Affiant was at no time told that he had an absolute right to testify in his defense. Mr. Dean also threatened to withdraw from the case when affiant demanded to be allowed to tell the court that he wanted to testify.

R. 1-5, Freeman Aff. at ¶ 40. Freeman thus alleges, seventeen years post-trial, that his failure to testify in trial was not an exercise of his right to remain silent, and was not the result of a knowing and voluntary waiver of his right to testify, but was against his will and due to his attorney's improper interference.

The district court recognized that such a self-serving affidavit must be reviewed with great skepticism. The court also recognized that waiver of a defendant's right to testify is presumed unless there is evidence that he notified the trial court of his desire to testify and of his disagreement with defense counsel. *See United States v. Bass*, 460 F.3d 830, 839 (6th Cir. 2006); *United States v. Webber*, 208 F.3d 545, 550-51 (6th Cir. 2000). Further, the court recognized that the trial record was devoid of evidence that Freeman ever protested counsel's refusal to allow him to testify or that he otherwise alerted the trial court to his desire to testify. Yet, notwithstanding these three reasons to reject the claim, the district court ignored the presumption recognized by controlling Sixth Circuit law and fully credited Freeman's inherently suspect and unsupported affidavit.

Freeman's affidavit statement that Dean prevented him from exercising his right to testify and even from alerting the trial court to his disagreement with counsel, being essentially refuted by

the silence of the trial record, is inherently unreliable.[3]  This is the very situation for which the presumption of waiver is recognized.  *See Webber*, 208 F.3d at 551.  Because defense counsel is presumed to have informed his client of his rights, "[b]arring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record."  *Id.*  "A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel."  *Id.*  When a defendant does not alert the trial court to a disagreement, waiver of the right to testify is presumed. *Id.*; *see also Goff v. Bagley*, 601 F.3d 445, 471 (6th Cir. 2010) (applying presumption).

Hence, because the trial record shows that Freeman did not alert the trial court during trial to what he now claims was a disagreement with defense counsel about whether he should testify, he is presumed as a matter of law to have waived his right to testify.  Indeed, "[a] contrary rule would require courts to hold an evidentiary hearing any time a defendant who did not testify at trial filed an after-the-fact statement saying that he wanted to testify but was prevented from doing so."  *Hodge v. Haeberlein*, 579 F.3d 627, 639 (6th Cir. 2009).  Freeman's own self-serving affidavit, otherwise unsupported, is insufficient to rebut the presumption that he knowingly and voluntarily waived his

---

[3]Freeman's statement is also refuted by prosecuting attorney Robert Cleland's affidavit, recounting the circumstances he observed surrounding Freeman's decision not to testify.  R. 49-2, Cleland Aff. ¶¶ 33-40.

right to testify. Freeman's affidavit thus carries little weight in furtherance of showing actual innocence.

(b) *Michelle Woodworth Affidavit*

Next, Freeman relies on the September 12, 2002 affidavit of Michelle Woodworth, who was his girlfriend (and was apparently pregnant with their child) at the time of the murder. In relevant part, the affidavit indicates that Woodworth would have testified in support of Freeman's alibi if she had been called as a witness; that she would have testified that Freeman was with her in Escanaba the entire day of November 5, 1986; and that she made herself available to defense counsel Dean, told him what she knew, and assumed she would be called as a witness, but was neither subpoenaed nor requested to testify.

This information is "new" only insofar as Woodworth was not called to testify at trial. The information was known to Freeman's trial counsel at the time of trial, but he made a strategic decision not to call her. Dean explained to the trial court, arguing for an evidentiary hearing on Freeman's motion for new trial on June 15, 1987, that he had made the decision not to call her as a witness. Three reasons are evident from the hearing transcript. First, Woodworth's credibility was subject to impeachment because she was Freeman's girlfriend and had initially lied to police officers on November 15, 1986—saying she did not know Freeman and the man she was living with did not match Freeman's description. Second, Dean was concerned that Woodworth—because of her familiarity with Crystal Merrill, Freeman's behavior and activities, and Freeman's possession of a shotgun and other weapons—would be used on cross-examination to corroborate the testimony of

prosecution witnesses. Third, Dean believed that Freeman's alibi would be persuasively established by other disinterested witnesses, one of whom was particularly excellent, rendering Woodworth's potential testimony cumulative.

Dean's assessment of the value of Woodworth's potential testimony was altered by the prosecution's rebuttal proofs. The alibi witnesses who did testify were able to place Freeman in Escanaba several hours before and several hours after the time of Macklem's murder, approximately 9:00 a.m. on November 5, 1986. Since the record showed that Escanaba is well over 300 miles and at least a five-hour drive from Port Huron, it would have been nearly impossible for Freeman to drive between the two locations between the times he was reportedly observed in Escanaba by these witnesses and the time of the murder. In rebuttal, the prosecution presented evidence that a small plane could make the trip in less than two hours. There was no evidence substantiating the hypothetical possibility that Freeman had ever made such a trip between Port Huron and Escanaba. Still, at this point, Woodworth's account that she was with Freeman in Escanaba at the very time of the murder arguably became more important. She had not been subpoenaed, however, was not called, and her testimony had not been preserved. After the jury returned its verdict on May 18, 1987, Freeman moved for a new trial, contending that Woodworth had been located and was willing to testify in support of his alibi. The trial court appreciated the significance of Woodworth's potential testimony, but denied the motion, holding that the proffered evidence was not newly discovered and reasonable diligence was not exercised to preserve it.

Thereafter, the issue of Woodworth's testimony was not raised in Freeman's direct appeal. Freeman contends he requested appellate counsel to raise the issue, but counsel declined to do so. The issue re-emerged for the first time in Freeman's 2004 motion for relief from judgment. The trial court rejected Freeman's argument as follows:

> Ms. Woodworth's testimony would have been cumulative, as several other witnesses testified that they had seen or spoken with Defendant on the day of the incident. The *jury heard testimony from these other alibi witnesses, and obviously rejected it as unreliable.*

R. 19-25, Opinion and Order at 8. The Michigan Court of Appeals and Supreme Court denied leave to appeal this ruling.

Freeman offers no explanation for his ten-year delay in pursuing the issue in post-conviction proceedings. Although Woodworth's testimony was not presented at trial, the information contained in her affidavit was known to Freeman and his attorney at the time of trial. Counsel then made a strategic decision not to call Woodworth because her credibility was questionable, her alibi testimony was cumulative, and she might hurt the defense more than help it. Indeed, if Woodworth had been called, her testimony may very well have entailed all the liabilities that Dean anticipated and done more damage than good. Nor can her affidavit be deemed to clearly demonstrate Freeman's innocence. The jury clearly rejected the testimony of Freeman's disinterested, even more credible alibi witnesses, concluding either that they were mistaken about the date of their observations of Freeman in Escanaba or influenced by Freeman's manipulation. There is no reason to believe that the jurors would not have been just as likely—if not more likely—to view the totality of the evidence as justifying their disbelief of Freeman's girlfriend's alibi testimony, too. Although

Woodworth had ceased to be Freeman's girlfriend at the time she signed the 2002 affidavit, she was then, and apparently remains today, the mother of the child Freeman fathered, with whom she was pregnant at the time of the murder. Woodworth's credibility thus remains suspect. For all these reasons, Woodworth's affidavit, signed fifteen years later, falls far short of the sort of extraordinary showing—like exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—needed to establish Freeman's actual innocence.

(c) *Philip Joplin's "Recantation"*

The most important new item relied on by Freeman is jailhouse informant Philip Joplin's "recantation" of his trial testimony. Before considering the recantation, we review Joplin's role in the trial.

Joplin had been detained with Freeman in a jail cell for a short period of time on April 20, 1987, days before Freeman's trial commenced. Joplin had pleaded guilty to, and was about to be sentenced for, receiving and concealing stolen property in the Port Huron area and being a second felony offender. During their brief time together, Freeman talked to Joplin about the murder charge he was facing. Later that day, Joplin was sentenced, receiving a sentence with an anticipated release date just three months later, in July 1987. Two days later, Joplin wrote a letter to the St. Clair County Prosecutor, reporting his conversation with Freeman. Joplin was then returned to the Michigan Department of Corrections Reception & Guidance Center in Jackson, where Joplin was incarcerated, before being transported back to St. Clair County the following week to testify in the Freeman case.

Joplin testified in Freeman's trial that during their time together, Freeman told him that he was charged with murder, that he had an airtight alibi, and that "when he shot this guy he screamed." R. 19-15, Trial Tr. at 1348-49. This is the sole incriminating statement related by Joplin. Joplin said that Freeman smiled as he spoke, that Freeman "wasn't worried at all," and that Freeman's attitude "scared" him. *Id.* at 1350. He testified that Freeman described his alibi defense in detail. Joplin testified that he had neither been promised anything nor threatened in any way to induce him to testify in the Freeman trial. His letter to the prosecutor was motivated, he said, by a desire to change what had been characterized in his own presentence report as his "jail attitude and mentality." *Id.* at 1353-54.[4]

During vigorous cross-examination, Joplin did not waver. Joplin denied that he was testifying in order to obtain an early release, saying he did not need one. Defense counsel Dean attempted to impeach Joplin's credibility based on his history of offenses involving dishonesty. Joplin acknowledged that Freeman, in explaining his alibi, said he was in Escanaba on the day of the murder and there were other people who saw him there. He did not retreat, however, from his account of Freeman's description of the victim's reaction when shot. Joplin resisted Dean's characterization that *he* was implicating Freeman in murder, saying "I'm not implicating anybody in anything." *Id.* at 1371. Dean persisted, asking, "And now you're over here trying to say that this

---

[4] Joplin was thirty-eight years old at the time he testified, and said he had spent thirteen or fourteen years in prison. R. 19-15, Trial Tr. at 1360.

man, who's denied ever being involved, confesses to you?"   Joplin's answer:  "If you can call that one sentence he made a confession, yes."  *Id.* at 1373.

Joplin testified on re-direct that Freeman's incriminating statement stood out in his mind because "it shocked me that somebody could scream being shot with a shotgun. . . . I thought you instantly died when you got shot with a shotgun."  *Id.* at 1375-76.  Joplin denied that he had been coached on how to testify, saying the prosecutor had instructed him "to say what I remembered and that was it."  *Id.* at 1377.  On re-cross, Joplin reiterated that everything he testified to was the "entire truth."  *Id.* at 1382.

Joplin's testimony thus became, at the eleventh hour, part of the prosecution's case against Freeman.  It was controverted by the testimony of a second detainee, Booker Brown.  Brown was in the same holding cell for part of the time when Freeman and Joplin were together.  He testified that he only heard Freeman denying any involvement in the murder.

The truthfulness of Joplin's testimony was addressed again in a September 4, 1990 hearing on Freeman's motion for new trial.  At that time, Joplin confirmed that he had not been offered a deal by the prosecutor in exchange for his trial testimony.  When he was transported back to St. Clair County from Jackson to testify, however, he said he had been told by his parole officer and a police detective that he would not be returned to prison to serve his remaining three months.  Rather, the parole officer suggested Joplin would probably be sent to a corrections center in Port Huron.  And in fact, Joplin did not return to prison in Jackson after he testified in the Freeman trial, but was given a community corrections placement.  On cross-examination, Joplin confirmed the truthfulness of

his trial testimony that he had not been promised anything as an inducement to testify. He further

explained that a prosecuting attorney told him *after* he testified that he "would benefit from this and

make some friends along the way." R. 19-21, Hearing Tr. at 53-54.

Joplin thus essentially confirmed in sworn testimony in 1990 the truthfulness of his trial

testimony three years earlier. The motion for new trial was denied.

In 1993, new questions emerged. In a series of three interviews witnessed by private

investigator Allen Woodside in 1993 and 1994, Joplin explained that his trial testimony against

Freeman had been false. The contents of these interviews are detailed in an affidavit signed by

Woodside on July 15, 1994, attesting to the accuracy of his account of Joplin's statements. R. 1-6

at 37.[5] According to Woodside's affidavit, Joplin admitted: that he had falsified his trial testimony;

that Freeman had actually denied involvement in the Macklem murder when they were briefly

detained together in April 1987; and that he had volunteered to testify against Freeman because he

thought his cooperation might result in a shortened stay in prison. When he came to have second

thoughts about testifying, Joplin reportedly said that he was pressured by his parole officer and

coached by the prosecution team. Woodside said Joplin admitted that he never disclosed the falsity

of his testimony to anyone. By way of explanation for now admitting his perjury, Joplin explained:

that he was suffering from cirrhosis of the liver, hepatitis C, and pneumonia; that he had been told

his condition was terminal and that he might have less than a year to live; and that he wanted to

---

[5] Joplin's statements were never incorporated into an affidavit signed by Joplin, however. Nor did Joplin ever verify or adopt Woodside's account of his statements.

"clear his conscience by confessing and recanting the false statements he gave in testimony that led to Freeman's conviction." *Id.* at ¶¶ T, V, X.[6]

Joplin's recantation would appear to be significant. Yet, it is presented only in the form of unsworn hearsay and was not effectively raised to the attention of the courts until 2004, ten years later and long after Joplin had died in 1998. Freeman offers no explanation for the delay and no explanation for his failure to preserve Joplin's changed story in a sworn affidavit or deposition, even though Joplin said his condition was terminal and even though he continued to live for several years.

Woodside's account of Joplin's unsworn recantation is inherently unreliable.[7] As an unsworn statement by a convicted felon purporting to recant sworn testimony originally given in trial and substantially confirmed under oath three years later, its reliability is inherently suspect. *See McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (recognizing that even *sworn* affidavits recanting trial testimony are viewed with "extreme suspicion"); *Matthews v. Ishee*, 486 F.3d 883, 895-96 (6th Cir. 2007) (same); *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (same); *Welsh v. Lafler*, 444 F. App'x 844, 850 (6th Cir. 2011) (affirming denial of habeas relief notwithstanding sworn recantation of trial testimony).

Freeman maintains that Joplin's changed version, as recorded in Woodside's affidavit, is attended by various indicia of reliability. First, he contends Joplin's recantation is corroborated in

---

[6]It appears Joplin died four years later, in 1998.

[7]In addition, the contents of Joplin's statement as recorded in the Woodside affidavit are directly refuted in several respects by the affidavits of then-prosecuting attorneys Robert Cleland and Ken Lord. *See* R. 49-2, R. 49-3, respectively.

part by Joplin's sworn testimony in 1990 to the effect that he did receive consideration for his testimony against Freeman in the form of an early release from prison. This argument deserves little weight. As explained above, Joplin's 1990 testimony substantially confirmed his trial testimony that Freeman had incriminated himself in Macklem's murder and that he, Joplin, was not promised anything or threatened in any way to induce his trial testimony. Even though Joplin reported in 1990 that his parole officer and a police officer had advised him that he would not be returning to prison, this came *after* he had received a sentence the week before that yielded an anticipated release date just three months later. In his 1990 testimony, Joplin did not characterize or view his corrections center placement following Freeman's trial as "consideration" for his testimony. Instead, it appears likely that Joplin was not returned to prison in Jackson but was assigned to a community corrections placement in the Port Huron area, not because of his willingness to testify, but as a function of the short sentence he had received *before* he even sent the letter offering the prosecutor his assistance.

Second, Freeman contends Joplin's recantation was made in contemplation of his mortality for the purpose of clearing his conscience. Freeman concedes the statements do not amount to a "dying declaration," made admissible as a hearsay exception under Mich. R. Evid. 804(b)(2). He argues, however, that they represent statements against penal interest, because they exposed Joplin to the possibility of prosecution for perjury and are therefore reliable and admissible under Mich. R. Evid. 804(b)(3). Yet, Michigan law recognizes that a statement against interest by an unavailable declarant that tends to exculpate the accused is admissible under Rule 804(b)(3) only if the trustworthiness of the statement is sufficiently corroborated under all the circumstances. *See People*

*v. Barrera*, 547 N.W.2d 280, 287-88 (Mich. 1996); *see also*, *United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2009) (accord, applying Fed. R. Evid. 804(b)(3)).

Joplin's purported recantation is not verified by his own signature and oath. Nor did Joplin ever adopt Woodside's account of his statement. Considering the potential significance of Joplin's statement to Freeman's pursuit of post-conviction relief, the unexplained failure to obtain Joplin's verification looms large. This failure is particularly troubling, considering that Joplin's statement was witnessed by a private investigator and a television news reporter. That is, although the need for verification would seem to have been obvious, it was not obtained.

Moreover, Joplin's unsworn statement is not only directly contrary to his trial testimony; it is also contrary to his testimony in the 1990 evidentiary hearing. In both prior court proceedings, Joplin's accounts of his holding-cell conversation with Freeman did not vary, despite cross-examination. Granted, Joplin's changed version of the conversation is arguably corroborated by the trial testimony of Booker Brown, the only other witness who was privy to at least part of the conversation between Freeman and Joplin. However, it is undisputed that Brown was not in the holding cell for the entire time that Joplin and Freeman were together.

Joplin's asserted motivation for recanting, to clear his conscience as he contemplated his impending death, lends credence to his unsworn statement, but it also undermines the "against interest" element of the Rule 804(b)(3) exception. That is, considering that Joplin remained incarcerated in 1993-94, when he gave the unsworn statement, and said he had little hope of recovering from the condition that was expected to take his life within six to twelve months, the fact

that he made the statement in the face of possible prosecution for perjury hardly represents a strong indicator of truthfulness—because the possibility of prosecution and punishment was necessarily remote.

Accordingly, Joplin's unsworn statement can hardly be deemed sufficiently corroborated under all the circumstances to be adjudged trustworthy under Rule 804(b)(3).

Furthermore, the Warden argues that even if Joplin's recantation were accepted and the trial jury were deemed not to have heard Joplin's testimony that Freeman admitted shooting Macklem, this would not create such a void in the prosecution's case as to make it more likely than not that no reasonable juror would have found Freeman guilty beyond a reasonable doubt. After all, the Warden points out that Joplin's trial testimony incriminating Freeman was not even mentioned in the prosecutor's closing argument. The Warden maintains that the jury's verdict was adequately supported by: Crystal Merrill's testimony about the abusive nature of her relationship with Freeman; witness testimony positively identifying Freeman leaving the scene right after the murder; evidence of telephonic statements Freeman made to Merrill after the murder corroborating the prosecution's theory of his motive for killing Macklem and implying knowledge of the whereabouts of the instrumentalities of the murder (i.e., shotgun and car); and impeachment of Freeman's alibi witnesses, whose testimony the jury appears to have rejected as either mistaken or the product of Freeman's manipulation. We agree. Under all the circumstances, Joplin's unsworn recantation hardly represents such clearly exculpatory evidence as would render it more likely than not that no reasonable juror would have found Freeman guilty of Macklem's murder after all.

### 3. *Assessing Actual Innocence*

We have thus considered each item of new evidence ostensibly relied on by the district court in holding that Freeman had carried his burden of establishing his gateway actual innocence claim. All four items are "new" only in that they were not presented at trial. None of the items is clearly exculpatory. There are strong reasons to question the reliability of each of the affidavits relied on by Freeman. Indeed, the reliability of all the items is impugned by the age of the information and Freeman's unexplained delay in pursuing relief. *See House*, 547 U.S. at 537. Why would a man as adamant about his innocence and as assertive of his rights as Freeman seems to be refrain for some ten years from asserting this exculpatory information and pursuing his post-conviction remedies? Freeman's failure to offer any answer to this question casts a pall over his arguments.

The affidavit evidence supporting Freeman's actual innocence claim is not unlike (and arguably less substantial than) that deemed insufficient in *McCray v. Vasbinder*, 499 F.3d 568 (6th Cir. 2007). In *McCray*, the district court had granted the petitioner an evidentiary hearing on his gateway actual innocence claim based on the submission of several recanting affidavits. After the evidentiary hearing, the district court held the petitioner was entitled to equitable tolling of the time-bar and granted habeas relief. The Sixth Circuit reversed the equitable tolling ruling, identifying reasons why reasonable jurors would discount each of the items of new evidence. The *McCray* court emphasized that equitable tolling based on actual innocence is an important but extraordinary remedy, not to be invoked in a "less-than-extraordinary case like McCray's." *Id.* at 577 (collecting

- 24 -

cases from other circuits). *See also Turner v. Romanowski*, 409 F. App'x 922 (6th Cir. 2011) (affirming denial of affidavit-based actual innocence claim without evidentiary hearing).

Here, similarly, where Freeman, for unexplained reasons, waited ten years after his conviction was finally affirmed by the state courts to seek post-conviction relief based on information that had been available to him for the entire time; and where the new evidence of actual innocence relied on consists essentially of (a) an affidavit of an alibi witness whose testimony was known to defense counsel and deliberately not used for strategic reasons, and (b) an unsworn statement by a prisoner of questionable credibility contradicting his sworn trial testimony; Freeman can hardly be said to have presented "new and reliable" evidence that distinguishes this case from the "less-than-extraordinary."

Accordingly, viewing the new evidence, as discussed above, in the context of all the evidence, incriminating and exculpatory, we cannot conclude that Freeman has carried his burden of demonstrating that this is the rare, extraordinary case warranting equitable tolling of the time-bar based on actual innocence. Freman has not carried his burden of demonstrating "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *McCray*, 499 F.3d at 571 (quoting *Schlup*, 513 U.S. at 327).

### 4. *Evidentiary Hearing*

Given that Freeman has failed to carry his burden of showing actual innocence, the question arises whether he presented sufficient new and reliable evidence to warrant an opportunity to further develop the facts in an evidentiary hearing. The district court initially denied Freeman's request for

an evidentiary hearing without prejudice, observing that the trial record was voluminous and that Freeman's petition was supported by multiple exhibits and appendices. In the same order, the district court did allow Freeman to supplement his petition and expand the record with exhibits and attachments. The district court did not revisit this ruling when deciding the merits of the petition because it deemed the existing record adequate to support its decision. The above analysis exposes the inadequacy of the existing record to justify equitable tolling. So, the question becomes whether, instead of outright reversing the district court's judgment and remanding for entry of an order denying the writ as time-barred, we should vacate and remand for an evidentiary hearing.

The decision whether to grant or deny an evidentiary hearing is reviewed for abuse of discretion. *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011). The district court shall not hold an evidentiary hearing on a habeas claim unless the petitioner, who failed to develop the factual basis of the claim in state court, "shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. 2254(e)(2)(A)(ii). "Diligence for purposes of § 2254(e)(2) depends on 'whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.'" *Robinson*, 663 F.3d at 824 (quoting *McAdoo v. Elo*, 365 F.3d 487, 500 (6th Cir. 2004)).

Here, Freeman did present the same factual basis for his petition to the state court in support of his motion for relief from judgment. The state trial court determined that no evidentiary hearing was needed for further factual development and denied relief on the record presented. Thus, although Freeman has not explained why he waited until 2004 to pursue post-conviction relief based

on information that had been available to him for years, he arguably exercised due diligence in attempting to further develop the factual bases for his claim in the state courts.

Assuming that Freeman has been diligent, we consider whether he has shown that an evidentiary hearing is warranted. In the context of Freeman's gateway claim for equitable tolling, we must consider whether an evidentiary hearing can realistically be expected to enable him to prove his factual allegations, which, if true, would entitle him to relief. *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). "If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts." *Schriro*, 550 U.S. at 475. Thus, we scrutinize the existing record with an eye toward determining how it might realistically be expanded to enable petitioner Freeman to demonstrate his actual innocence.

The most important new evidence of Freeman's actual innocence is Joplin's unsworn statement. As explained above, however, the trustworthiness of Joplin's unsworn recantation, controverting sworn testimony he had given on two prior occasions, is questionable. If Joplin could be called to have his recantation tested under oath and under cross-examination, then his credibility and motivation could be assessed and the factual basis for Freeman's actual innocence claim might be bolstered. However, Joplin is deceased. The trial testimony of Booker Brown, corroborating Joplin's unsworn account of his conversation with Freeman, has already been memorialized. Also included in the record are the affidavits of prosecuting attorneys Cleland and Lord, summarizing the

testimony they would have given if an evidentiary hearing had been granted, and disputing Joplin's unsworn representations that he had been pressured and coached to testify falsely at trial. While Cleland and Lord are likely available to testify at an evidentiary hearing, their affidavits do not indicate that their testimony would tend to help Freeman prove his actual innocence.

Similarly, it is doubtful that the significance of Michelle Woodworth's affidavit could be enhanced in an evidentiary hearing. If she appeared at a hearing, Woodworth would presumably testify in a manner consistent with her affidavit.[8] From the time of trial, there appears not to have been a question about what Woodworth's testimony would have been if called. Nor has any reason been suggested to believe that her alibi testimony would have been viewed as more credible than the testimony of other disinterested alibi witnesses whose testimony the jury rejected. On the other hand, if she took the stand and were subject to cross-examination, the State would have the opportunity to put her credibility to the test in the very ways Freeman's counsel was concerned about at the time of trial.

Hence, it does not appear that an evidentiary hearing, focused on the new evidence of Freeman's asserted factual innocence, would help Freeman demonstrate that his case is the rare and extraordinary one that deserves equitable tolling. When asked during appellate oral arguments what

---

[8]Despite her affidavit, we note there is reason to question whether Woodworth would willingly appear to give sworn testimony. Her affidavit was signed almost ten years ago, in 2002. The record also includes a letter written earlier that year by Freeman to his children, Kari and Leyna. R. 49-6. It is a long, bitter, caustic letter in which Freeman refers to Leyna's mother, Michelle, as evil, selfish, spiteful and untruthful ("every word from her mouth was a lie").

additional evidence might be adduced at an evidentiary hearing, Freeman's counsel was unable to identify any additional support for his actual innocence claim.

In *Schriro*, the Court cautioned against unnecessarily disturbing the finality of state court judgments and conducting evidentiary hearings based on insubstantial factual allegations. As outlined above, Freeman's actual innocence showing in the present record is based on evidence of suspect reliability that is not clearly exculpatory. He has failed to explain how an evidentiary hearing could realistically be expected to enhance the existing insufficient showing of his actual innocence. It is more likely that a hearing would diminish the strength of his case by exposing Woodworth and Joplin's unsworn statement to challenge by the State. An evidentiary hearing is therefore not warranted.

### III. CONCLUSION

We thus hold that Freeman has failed to carry his burden of showing either actual innocence or entitlement to an evidentiary hearing. His petition is time-barred. It follows that the remaining issues presented both by the Warden's appeal and Freeman's cross-appeal are rendered moot.

For the foregoing reasons, the district court's order conditionally granting the writ is **REVERSED** and the case is **REMANDED** for entry of an order dismissing the petition as time-barred. Freeman's cross-appeal, No. 10-2420, is **DISMISSED** as moot.