RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ADAM CARSON,

        *Petitioner-Appellant*,

    *v.*

UNITED STATES OF AMERICA,

        *Respondent-Appellee*.

Nos. 22-3386/3419

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
Nos. 1:17-cr-00008-1; 1:21-cv-01939—Donald C. Nugent, District Judge.

Decided and Filed:  December 13, 2023

Before:  BUSH, LARSEN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:**  Jeffrey B. Lazarus, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge.  A jury convicted Adam Carson of robbing a bank and tampering with a witness; a district court sentenced him to 20 years in prison; and we upheld his convictions and sentence on direct appeal.  In these post-conviction proceedings, Carson argues that his trial attorney provided ineffective assistance by failing to initiate plea negotiations and by committing several trial mistakes.  He also argues that he did not knowingly waive his right to testify.  Yet Carson's ineffective-assistance claims fail on prejudice grounds.  Even if a dispute

of fact exists over whether he asked counsel to look into a plea deal, only speculation supports his claim that the parties would have reached a deal but for counsel's inaction. The overwhelming evidence of his guilt also shows that counsel's conduct at trial did not affect the verdict. Lastly, Carson did not object to his counsel's statement that he did not want to testify. So our cases require us to presume that he knowingly waived this right. And while Carson now asserts that counsel misrepresented his wishes, he cannot rebut our presumption with this after-the-fact allegation. We affirm.

## I. Background

In September 2016, Carson lived outside Cleveland, Ohio. He met and soon began a relationship with Karin Deeb. Both Carson and Deeb suffered from a drug addiction. After Carson got arrested that November, his mother learned that his relationship with Deeb had caused him to relapse. She tried to find a rehabilitation center for him to enter treatment. But no centers had immediate openings. She thus paid for Carson to stay temporarily at a Days Inn.

While staying at the hotel, Carson quickly reconnected with Deeb. The couple spent the next week smoking crack and brainstorming how they could get more money to fund their drug habit. They decided to rob a bank and began to plan the robbery. Among other things, they bought Carson inconspicuous clothes to wear and a fake mustache and goatee to disguise him.

On November 21, Carson and Deeb drove west of Cleveland to commit the robbery. Stopping in Amherst, they chose a Chemical Bank branch as their target. Deeb first scoped out the bank. She then waited in the car while Carson entered around 4:30 p.m.

The bank's security cameras captured the robbery. Carson wore a baseball cap, black glasses, a green jacket, gray gloves, a blue pinstriped shirt, jeans, and fake facial hair. He held up a note to a teller that read: "I want all your money, no bait, or I'll hurt you." Johnson Tr., R.100, PageID 541. After she gave him the money, he told her to wait two minutes until she set off the alarm. He then ran to the car and told Deeb: "Let's go, let's go, let's go." Deeb Tr., R.102, PageID 1053. Carson made off with $5,590.

The couple drove back to Cleveland. They immediately bought more drugs. That night, they chose to stay at a pricier Holiday Inn with a jacuzzi in downtown Cleveland. Carson hid the cash in their hotel room.

Carson and Deeb got into a fight while away from the hotel after midnight on November 23. She left him at a gas station. Around 1:00 a.m., Carson called the Holiday Inn to alert staff not to let Deeb into their room because "she was coming to steal all of his money[.]" Austin Tr., R.101, PageID 936. A security guard smelled smoke and found drugs when checking on the room. Staff locked the room down. Carson returned that morning. While escorted by security and the police, he gathered his belongings. Carson showed the officers two socks filled with money that he pulled from hidden locations in the room.

Carson and Deeb soon made up, bought more drugs, and checked into a Motel 6. Yet they got into another fight that evening. Carson eventually passed out. Deeb drove off with the rest of the money in the early morning hours on November 24.

Without money or a ride, Carson left the motel on foot. He walked for miles. Eventually, he stopped at a gas station and called Deeb. When she did not pick up, he stole a car from a gas-station customer just before 7:00 p.m.

Police apprehended Carson about two hours later. While still under the influence of drugs, he told the police that a woman with a last name of "Deeb" had drugged him and taken "everything with her" from their hotel. Perhacs Tr., R.101, PageID 797. The police took an inventory of items found on Carson's person and in the stolen car. They discovered gray gloves and a blue shirt that resembled the gloves and shirt the robber had worn.

Around the same time, a local newspaper's website affiliate ran a story about the robbery that contained a picture of the suspect from the bank's cameras. The picture generated many calls identifying Carson as the culprit. Two officers with another local police department had recently investigated him. They believed that Carson matched the picture and alerted Amherst police. Carson's neighbor also saw the picture on her Facebook newsfeed and told the police that it resembled Carson. Carson's parole officer likewise recognized him and did the same.

Meanwhile, Deeb spent the remaining robbery proceeds on drugs and another hotel. The authorities soon contacted her. She lied to the FBI and to the grand jury about her involvement. She then robbed a second bank while high. After the authorities detained Deeb for this second heist, they discovered her role in Carson's robbery and brought charges against her in federal court. Deeb pleaded guilty to aiding and abetting Carson's robbery and lying to the grand jury. As part of that plea agreement, she agreed to testify at Carson's trial.

The government eventually charged Carson with bank robbery, in violation of 18 U.S.C. § 2113(a). After Carson learned of Deeb's cooperation, he sent her a letter from jail. While continuing to profess his love for Deeb, Carson attempted to cajole her not to testify. Among other things, he threatened that her "character will be assassinated" if she testified. Letter, R.144-1, PageID 1615. "[T]o make things right," he instructed, Deeb should "either explain the Detectives pressured" her into falsely accusing him or stay silent. *Id.* Deeb gave this letter to the authorities. The government decided to charge Carson with a second count: witness tampering, in violation of 18 U.S.C. § 1512(b)(1).

The jury found Carson guilty on both counts. The district court sentenced him to 240 months' imprisonment. We affirmed. *United States v. Carson*, 796 F. App'x 238, 239 (6th Cir. 2019).

Carson then moved to vacate his sentence under 28 U.S.C. § 2255. Among his grounds for relief, Carson alleged that his trial counsel had provided ineffective assistance and that he had not knowingly waived his right to testify. He also requested an evidentiary hearing. Without holding a hearing, the district court denied Carson's motion and denied him a certificate of appealability. *Carson v. United States*, 2022 WL 845478, at *8 (N.D. Ohio Mar. 22, 2022).

Carson appealed. A circuit judge granted Carson a certificate of appealability on several grounds. *See Carson v. United States*, 2023 U.S. App. LEXIS 1239, at *28 (6th Cir. Jan. 18, 2023). But we will consider only his claims that his trial counsel provided ineffective assistance and that the district court violated his right to testify. He has forfeited all other claims by failing to raise them in his briefing. *See Maldonado v. Wilson*, 416 F.3d 470, 478 (6th Cir. 2005).

## II.  Ineffective Assistance of Counsel

The Sixth Amendment gives a criminal defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  The Supreme Court has interpreted this text to guarantee indigent defendants the right to the effective assistance of a lawyer paid for by the government. *See Strickland v. Washington*, 466 U.S. 668, 684–86 (1984).  When defendants disapprove of their lawyer's performance, they must satisfy two well-known elements to establish a Sixth Amendment violation. *Id.* at 687.  A defendant first must show deficient performance: "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  The defendant then must show prejudice: "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Here, Carson alleges that his attorney violated the Sixth Amendment both at the plea stage and at the trial stage.  We will address these claims in turn.

### A.  Counsel's Conduct at the Plea Stage

1. *Pretrial Proceedings*.  Carson's argument that his lawyer performed deficiently during the plea process requires us to summarize his pretrial proceedings.  Given Carson's indigency, the district court appointed Donald Butler to represent him in January 2017.  Five months later, Carson asked for new counsel on the ground that Butler had not done enough work.  The district court denied this motion.  After months of litigation over Carson's competency, Carson again complained about Butler.  The court told him that he could either pay for the lawyer of his choice or stick with Butler.  Lacking funds, Carson chose the second option.

In February 2018, the court held a hearing about the status of the parties' plea negotiations.  The court told Carson that it generally scheduled this type of hearing so that defendants who go to trial cannot later allege they did not know they "could have pled guilty" and obtained a shorter sentence. Tr., R.139, PageID 1584–85.  The prosecutor explained that the parties had not engaged in any "discussions" about a plea deal and that it had made "no real plea offer" to Carson. *Id.*, PageID 1585, 1590.  She estimated Carson's guidelines range as 210 to 262 months' imprisonment if he went to trial or 151 to 188 months' imprisonment if he accepted responsibility by pleading guilty.  While recognizing the risks of trial, Carson responded: "I can't

plead guilty to a crime I didn't commit." *Id.*, PageID 1586. He then reraised his complaints about Butler, suggesting that his lawyer had overlooked "a lot of evidence that's going to prove that I didn't rob this bank[.]" *Id.*, PageID 1588.

The court set the trial for April 9. Three days before, however, a medical emergency put Butler in the hospital. The trial thus could not occur as scheduled. On April 9, Carson instead sent a letter to his then-hospitalized attorney expressing a newfound willingness to plead guilty. After thinking "long and hard," Carson said, he could not risk a 20-year sentence. Letter, R.180-2, PageID 1906. Carson proposed a plea bargain in which he would plead guilty to witness tampering, the government would dismiss the bank-robbery count, and he would receive a sentence between six and eight years. Carson emphasized: "Will plead guilty today! No trial!" *Id.*, PageID 1907.

The next day, the court held a hearing to discuss how proceedings would move forward in light of Butler's hospitalization. Carson said he would consent to the appointment of another lawyer and to a delay of the trial. The court decided that it would check on Butler's status before making any decisions. Carson did not mention a willingness to plead guilty to the court.

On April 19, though, Carson sent a second letter to Butler about a plea. He asked for documents in this letter. In a "P.S.," he added: "I wrote you about 10 days ago about wanting to take a plea. Please let me know what's happening. I do not want to go to trial! I want to get this case over with." Letter, R.180-4, PageID 1910.

After Butler's health improved, the court reset the trial for June. That May, Carson moved for substitute counsel because of Butler's medical problems. Carson again did not mention a desire to plead guilty. The district court denied the motion. This time, the trial occurred on schedule.

At sentencing, Carson reiterated his criticisms of Butler. He mentioned that he had sent Butler "two letters instructing him to work out a plea agreement" because he feared that Butler would do a poor job at trial. Tr., R.131, PageID 1519. According to Carson, Butler told him that "the plea agreement was off the table and not to worry because this is a good trial case." *Id.*, PageID 1520. Carson alleged that Butler's refusal to look into a plea deal "was unethical,

unprofessional, unlawful, and unconstitutional." *Id.* In response, Butler accused Carson of "misleading" the court because Carson had "never wanted to plead" guilty. *Id.*, PageID 1532–33. Butler suggested that Carson never discussed taking a plea with him.

In his § 2255 motion, Carson asserted that Butler provided ineffective assistance by failing to "accept the plea agreement offered by the Government," and he attached his two letters about a plea in support. The government responded with an affidavit from Butler. Butler averred that "Carson never expressed a desire to plead guilty to the bank robbery charge" and that the prosecutors "would not entertain a plea that did not include" that charge. Aff., R.176-4, PageID 1864. The government's briefing added that Carson's proposed plea to witness tampering "was not one that the Government" had any interest in pursuing. Resp., R.176, PageID 1829.

The district court denied Carson's claim. It saw no evidence that the government offered Carson a plea. *Carson*, 2022 WL 845478, at *3. The court also pointed to Carson's unequivocal statements during the February 2018 hearing that he wanted to go to trial. *Id.* The court ultimately held that Butler was not "deficient for failing to accept a plea that did not exist." *Id.*

2. *Law*. The Supreme Court has held that the Sixth Amendment right to the effective assistance of counsel applies at all "critical" stages of the criminal proceedings, including the plea-bargaining stage. *See Missouri v. Frye*, 566 U.S. 134, 140–44 (2012). The Court has also identified various ways in which lawyers can violate this right during plea bargaining. Sometimes, a lawyer's deficient performance might lead a client to *plead guilty* rather than *stand trial*. Counsel, for example, might wrongly inform an immigrant client that a guilty plea will have no deportation consequences. *See Lee v. United States*, 582 U.S. 357, 369 (2017); *Padilla v. Kentucky*, 559 U.S. 356, 366–69 (2010). To prove prejudice in this situation, defendants must show that they would have stood trial if their lawyers had not committed the mistakes that made their representation deficient. *See Lee*, 582 U.S. at 364–65.

Other times, a lawyer's deficient performance might lead a defendant to *stand trial* rather than *accept a plea offer*. *See Lafler v. Cooper*, 566 U.S. 156, 162–64 (2012). Counsel might wrongly fail to convey the prosecution's offer to a client. *Frye*, 566 U.S. at 145. Or counsel

might convince a client to reject the offer based on an overestimation of the strength of the client's case. *See Lafler*, 566 U.S. at 160–61, 166. The Supreme Court's decisions in *Lafler* and *Frye* establish the rules for proving prejudice in these circumstances. Defendants must show a "reasonable probability" that they would have accepted the offer but for counsel's deficiency. *Lafler*, 566 U.S. at 164. And they must show a "reasonable probability" that the court would have approved of the plea deal and that the deal would have led to a "less severe" outcome for the client than the outcome that resulted from the trial. *Id.*; *see Frye*, 566 U.S. at 147.

Yet *Lafler* and *Frye* left an important question unanswered. Those cases addressed claims that lawyers deficiently precluded their clients from accepting the prosecution's "formal" plea offer. *Frye*, 566 U.S. at 145; *see Lafler*, 566 U.S. at 161. What happens if the prosecution never makes an offer? Many courts have held that a defendant cannot make out an ineffective-assistance claim unless the prosecution puts a plea deal on the table. *See Byrd v. Skipper*, 940 F.3d 248, 263–68 (6th Cir. 2019) (Griffin, J., dissenting) (collecting cases). After all, defendants do not have a right to have the prosecution offer a deal or for the trial court to accept one. *See Frye*, 566 U.S. at 148; *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).

Nevertheless, our court has rejected this approach. In *Byrd*, we held that defense counsel can provide ineffective assistance in violation of the Sixth Amendment by failing to *initiate* plea negotiations even when the prosecution has proposed no plea terms. *See* 940 F.3d at 255–57. At the same time, we recognized that a defendant raising this type of ineffective-assistance claim must meet a "formidable standard" to prove prejudice. *Id.* at 257. The defendant must show a reasonable probability that the prosecution would have offered a plea deal, that the defendant would have accepted the proposed terms, that the trial court would have approved it, and that the deal would have contained better terms than the judgment that resulted from the trial. *Id.*

Carson cannot meet these standards here. His ineffective-assistance claim has evolved over the course of these § 2255 proceedings. But both of his theories lack merit.

Theory One: In the district court, Carson tried to make his case look like *Lafler* and *Frye*. He alleged that Butler wrongly failed "to accept the plea agreement offered by the Government"

despite his instructions.  Mot., R.167, PageID 1733.  According to Carson, Butler "lied" to him that the prosecution had rescinded its offer.  *Id.*

This theory has an obvious problem: The prosecution *never* made any plea offer to Carson or his attorney.  The district court held a hearing in February 2018 to put the status of the plea negotiations on the record and prevent Carson from later asserting "fabricated claims" of ineffective assistance in the plea process.  *Frye*, 566 U.S. at 146.  At that hearing, the prosecution clarified that it had made "no real plea offer" to Carson.  Tr., R.139, PageID 1590.  And Carson clarified that he "[a]bsolutely" wanted to go to trial while knowing that a guilty verdict would result in a higher sentence.  *Id.*, PageID 1588.  Carson also cites no evidence that the prosecution offered a plea deal in between this hearing and the trial.  He thus now admits that "no plea agreement from the government existed[.]"  Appellant's Br. 30.

Theory Two: On appeal, Carson pivots to argue that Butler wrongly ignored his request to *initiate* plea negotiations with the government.  This new theory fares no better.  To be sure, we agree that a dispute of fact exists over Carson's communications with Butler about a plea deal.  On the one hand, Carson points to his two letters asking Butler to seek a plea and his comments at sentencing that Butler told him that a plea deal was "off the table[.]"  Tr., R.131, PageID 1520.  On the other hand, Butler claims that he and Carson never discussed a plea deal—at least not one in which Carson would plead guilty to bank robbery.

But this factual disagreement does not matter to the outcome.  Carson has not met our "difficult" prejudice test in the plea-negotiations context.  *Byrd*, 940 F.3d at 259.  He must show a "reasonable probability" that the government would have made a plea offer and that he would have accepted its terms.  *Id.* at 257.  Yet Carson points to no evidence establishing these elements.  *Cf. Merzbacher v. Shearin*, 706 F.3d 356, 370 (4th Cir. 2013).  The record contains nothing about what the prosecution's terms might have been or whether those (unknown) terms would have been acceptable to Carson.  Carson instead asks us to engage in the type of "speculation" that cannot establish prejudice.  *United States v. Rendon-Martinez*, 497 F. App'x 848, 849 (10th Cir. 2012) (Gorsuch, J., denying certificate of appealability) (citation omitted); *see Delatorre v. United States*, 847 F.3d 837, 846–47 (7th Cir. 2017); *Osley v. United States*, 751

F.3d 1214, 1225 (11th Cir. 2014); *Ramirez v. United States*, 751 F.3d 604, 608 (8th Cir. 2014); *United States v. Boone*, 62 F.3d 323, 327 (10th Cir. 1995).

If anything, the "contemporaneous evidence" cuts the other way. *Lee*, 582 U.S. at 369. In his first letter about a plea, Carson noted that he would plead guilty to the witness-tampering charge in exchange for the dismissal of the bank-robbery charge and a sentence of six to eight years. Letter, R.167-4, PageID 1776–77. Yet nothing suggests that the prosecution would have considered such a lenient plea deal. To the contrary, the only record evidence on this point shows that the prosecution would not "entertain a plea that did not include the bank robbery charge." Aff., R.176-4, PageID 1864. Carson also continued to say that he "didn't commit this crime" all the way through sentencing. Tr., R.131, PageID 1519. That fact undermines his claim that he would have accepted a plea, which would have required him to testify that he committed it (under oath and subject to the penalties for perjury). *See, e.g.*, *Welch v. United States*, 370 F. App'x 739, 743 (7th Cir. 2010) (order); *Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005).

The absence of evidence about the terms of any potential plea deal rebuts any reliance on *Byrd*. The defendant there was "uniquely" situated to prove prejudice. *Byrd*, 940 F.3d at 259–60. The prosecutor testified that he wanted to obtain a plea agreement but did not negotiate with defense counsel because counsel obstinately pushed for a trial based on a mistaken view of the law. *Id.* And since a codefendant had separately pleaded guilty, the defendant could point to a rough "comparator" of the plea offer that the prosecution would have made. *Id.* at 258. Here, by contrast, Carson does not even attempt to guess what the hypothetical terms might have been.

Carson responds that the district court at least should have held an evidentiary hearing because of the factual dispute over Carson's communications with Butler about a plea. He is correct that a district court must hold an evidentiary hearing if a genuine dispute of fact exists. *See Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018); *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013); *see also* 28 U.S.C. § 2255(b). But this dispute must concern a "legally important fact." *Wallace v. United States*, 43 F.4th 595, 607 (6th Cir. 2022). If a claim would fail even if a court construed the disputed fact in the defendant's favor, the court need not hold a hearing. *See id.* And here, Carson's claim fails on prejudice grounds even assuming that he

asked Butler to pursue a plea deal.  Simply put, Carson has presented nothing to show that the parties would have reached a plea agreement but for Butler's failure to negotiate.

### B.  Counsel's Conduct at Trial

Carson next argues that Butler committed four errors at trial.  First, he asserts that Butler should have objected to the testimony of Ronald Warchol, his parole officer.  A parole officer's testimony identifying a defendant as the suspect in a photograph can raise prejudice concerns under Federal Rule of Evidence 403 because the testimony can alert the jury that the defendant was on parole for a prior crime.  *See United States v. Calhoun*, 544 F.2d 291, 296 (6th Cir. 1976).  Yet the prosecutors in Carson's case sought to minimize this risk by concealing Carson's relationship with Warchol.  Carson now claims that Butler should have required the prosecutors to do more to conceal Warchol's role.  In opening and closing statements, for example, a prosecutor referred to Warchol as an "Officer."  Tr., R.99, PageID 502; Tr., R.103, PageID 1355–56.  Warchol also testified that he had "the occasion to meet and deal with" Carson while working for a "state agency[.]"  Warchol Tr., R.100, PageID 758–59.  According to Carson, the jury would have figured out from these statements that Warchol served as Carson's parole officer.

Second, Carson complains about Butler's silence when the prosecutor asked an allegedly improper question to his mother, who testified in his defense.  On direct, Carson's mother opined that the man in the bank-robbery picture was not her son.  She also explained the circumstances in which she had dropped him off at the Days Inn in mid-November.  She picked Carson up from jail after the police had arrested him for the possession of a potentially stolen furnace.  On cross, a prosecutor asked her whether she knew the circumstances of this arrest.  His mother conceded that she lacked personal knowledge.  The prosecutor then asked: "So you didn't know . . . that the furnace that your son tried to return to Webb Heating & Cooling had actually been taken out of the back of the van where [his friend's] dead heroin overdosed body lay?"  Carson-Lipscomb Tr., R.102, PageID 1275.  In response, Carson yelled out: "It's not true.  What's she talking about?"  *Id.*  The court did not respond to Carson's "objection."  Rather, his mother answered that she did not know anything about these facts.  Carson argues that Butler should have objected to the prosecutor's question because it amounted to prejudicial misconduct.

Third, Carson criticizes Butler for agreeing with some of the prosecutor's assertions during opening statements. Butler conceded that Carson had taken a car "that did not belong to him" and that he had gone on "drug binges" with Deeb while in a relationship with her. Tr., R.99, PageID 510–11. But Butler sought to lay the groundwork for the theory that Deeb (not Carson) had robbed the Chemical Bank. According to Carson, Butler should not have conceded that he had done drugs with Deeb or stolen a car because these facts undermined this defense and put him in a negative light with the jury.

Fourth, Carson criticizes Butler's closing argument. After recalling the bank teller's testimony that the robber stood around 5'6" to 5'7" tall, Butler opined that Carson's booking photo showed that he "barely reaches 5 feet or just over 5 feet." Tr., R.103, PageID 1374. Butler used this discrepancy to suggest that the teller misidentified Carson. Yet the prosecutor rebutted Butler's argument with Carson's driver's license, which listed him as 5'6". The prosecutor also explained the apparent height discrepancy by noting that the booking camera was "angled down" at Carson when it took his booking photo. *Id.*, PageID 1400. Carson now suggests that this part of Butler's closing helped to convict him.

The district court held that Butler had not performed incompetently in any of these ways. *See Carson*, 2022 WL 845478, at *4. Yet we need not reach these issues. Even considering the cumulative effect of Carson's complaints, he cannot establish prejudice. *See Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017). To prove prejudice in this trial context, Carson must establish a "reasonable probability" that the jury would have acquitted him if Butler had not made the four purported errors. *Strickland*, 466 U.S. at 694. The Supreme Court has described a "reasonable probability" as one that "undermine[s] confidence in the outcome." *Id.* And counsel's errors generally will not undermine a court's confidence in a guilty verdict when "overwhelming" evidence establishes that the defendant committed the crime. *Gabrion v. United States*, 43 F.4th 569, 589 (6th Cir. 2022); *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004).

That type of evidence existed here. The government presented an air-tight case that Carson robbed the Chemical Bank branch and tampered with Deeb to prevent her testimony. Indeed, Carson's briefing does not even try to prove prejudice for his witness-tampering

conviction. For good reason. The jury saw Carson's letter to Deeb and heard her testimony that he was trying to coerce her to lie.

We thus need only focus on his robbery conviction. There, too, Deeb testified in detail about the crime. She described how she and Carson planned the robbery in mid-November while doing drugs at the Days Inn his mother had paid for. She also explained how they executed the robbery on November 21. And she described the events that occurred in the next few days until she took the money and left Carson on November 24.

To be sure, Deeb lied to the police and the grand jury and also committed a second robbery without Carson. So Carson correctly notes that she had plenty of credibility issues. But overwhelming evidence also corroborated nearly every aspect of her story. To begin with, a Days Inn employee and Carson's mother both confirmed that he had been staying at the Days Inn the week before the robbery.

Next, apart from Deeb and Carson's parole officer, four witnesses identified him as the robber. A few weeks after the robbery, employees at the Chemical Bank learned that Carson had become a suspect. They found a picture of him on Facebook. When an employee showed Carson's picture to the bank teller who had been robbed, she exclaimed: "Oh, my gosh, that's him." Johnson Tr., R.100, PageID 555. She expressed "a hundred percent" confidence in her identification. *Id.*, PageID 557. Although the robber had facial hair and Carson did not, the teller had recognized at the time that the "mustache" and "goatee" were "fake" because "they were just so black" and "stuck on" with glue. *Id.*, PageID 536, 551–52. And contrary to the defense theory that Deeb committed the robbery, the teller opined that the robber had a "male's voice" and could not have been a female. *Id.*, PageID 548, 553.

Three others confirmed the teller's identification. Carson's neighbor expressed one "hundred percent" confidence that Carson was the robber portrayed on her Facebook newsfeed. Tabach Tr., R.100, PageID 744. She would not have called the police if she had any doubt. Two officers with a nearby police department also testified that they recognized Carson. Although the robber had facial hair, one of the officers explained that the goatee "stood out to [him] as being a fake." Selong Tr., R.100, PageID 696. And while Carson's mom did opine at trial that the

robber in the picture was not her son, the prosecution impeached her with her own prior inconsistent statements. During a jail call with Carson, she told her son that the picture looked just like him.

Apart from the eyewitness identifications, Carson's conduct also implicated him in the robbery. For example, staff at the Holiday Inn testified that Carson stayed there with a woman starting on November 21. One employee took a call from him in which he stated that the woman "was coming to steal all of his money . . . that he had in his room." Austin Tr., R.101, PageID 936. Both a security officer and a police officer then saw him pull out what looked "like a brick of money" hidden in two socks. Underwood Tr., R.101, PageID 947. He even showed the officers that the socks contained money. After his arrest for stealing a car, he also called Deeb. An officer heard him ask: "Are you enjoying the money?" Perhacs Tr., R.101, PageID 810.

Lastly, physical evidence confirmed Deeb's story. Officers found gray gloves and a blue pinstriped shirt (items that matched the robber's apparel) in Carson's possession or the car he stole. The jury also saw the bank-security video and pictures of the robber. In short, given all the evidence pointing to Carson's guilt, none of Butler's alleged shortcomings would have affected the outcome.

### III. Right to Testify

Switching to a different argument, Carson claims that he did not knowingly and voluntarily waive his constitutional right to testify at trial. He is again mistaken.

A. *Trial Proceedings*. After Carson's mother and her boyfriend testified in Carson's defense, Butler announced that Carson would "have no other witnesses." Tr., R.102, PageID 1308. The court began to discuss the plans for the last day of trial on the following Monday. Butler soon interrupted to disclose new information: "Judge, he says he wants to testify, and I think he better think about it." *Id.*, PageID 1309. The court responded: "He can. That's your right, of course. So maybe we'll hear from Mr. Carson on Monday morning." *Id.* The court then recessed for the weekend.

By Monday, Carson had changed his mind.  Butler explained to the court: "Judge, my client has informed me he does not want to testify, but he wants to do closing arguments.  So if the Court allows it, I have no objection to it."  Tr., R.103, PageID 1323.  The court rejected Carson's request to conduct his own closing because it did not permit hybrid representation.  It then asked whether the defense had any further testimony.  Butler said no and moved for acquittal under Federal Rule of Criminal Procedure 29.  The court denied this motion and prepared to call the jury into the courtroom to read the jury instructions.  At that point, Carson spoke up: "One issue, Your Honor."  *Id.*, PageID 1324.  The court responded: "Talk to your lawyer."  *Id.*  Neither Butler nor Carson ever put this purported "issue" on the record.

In his § 2255 motion, Carson argued that he did not knowingly waive his right to testify.  In an affidavit, he asserted that Butler did not meet with him over the weekend after he asked to testify.  Instead, Butler showed up on Monday and announced that Carson would "not be testifying."  Aff., R.167-3, PageID 1770.  Carson also claimed that he was attempting to invoke his right to testify when he asked the court to speak, but the court cut him off and told him to talk to his lawyer.  In response, the government again relied on Butler's affidavit.  Butler explained that he and Carson had discussed whether Carson should testify and Carson "elected not" to take the stand.  Aff., R.176-4, PageID 1864.  Butler swore that he "did not stop" Carson from testifying.  *Id.*

The district court denied this claim too.  *Carson*, 2022 WL 845478, at *6.  Whatever Carson's subjective wishes, the court reasoned, he had a duty to "notify the court" if he sought to testify despite his attorney's claim.  *Id.*  But Carson never flagged the issue at trial.  *Id.*

We review the district court's decision on the merits de novo.  *See United States v. Minor*, 2017 WL 11622729, at *1 (6th Cir. Nov. 27, 2017) (order); *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000).  Yet we first flag a non-merits question: Did Carson procedurally default this claim by failing to raise it in the district court before a final judgment or in his direct appeal?  *See Bousley v. United States*, 523 U.S. 614, 621–22 (1998).  The answer is not obvious to us.  *Cf. United States v. Anderson*, 695 F.3d 390, 396 (6th Cir. 2012), *overruled on other grounds by United States v. Burris*, 912 F.3d 386 (6th Cir. 2019) (en banc); *United States v. Willis*, 273 F.3d 592, 595–97 (5th Cir. 2001).  However, the government has raised no

procedural-default defense here, and we are "not 'required' to raise the issue … sua sponte." *Trest v. Cain*, 522 U.S. 87, 89 (1997). So we can save this preservation question for another day.

B. *Law*. The Constitution contains no clause expressly granting criminal defendants a right to testify at trial. The Supreme Court has instead found this right in a combination of different clauses. *See Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987). The Fifth Amendment clarifies that no defendant "shall be compelled in any criminal case to be a witness against himself" or "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. And the Sixth Amendment clarifies that a defendant has a right "to have compulsory process for obtaining witnesses in his favor[.]" U.S. Const. amend. VI. According to the Court, the implied right to testify arises from these express clauses as well as the implied right to self-representation that the Court has also rooted in the Fifth and Sixth Amendments. *See Rock*, 483 U.S. at 51–53.

Yet defendants need not use their implied right to testify. Rather, the Fifth Amendment also gives them an express right *not* to testify. *See United States v. Yono*, 605 F.3d 425, 426 (6th Cir. 2010). So defendants may remain silent and waive this right—as long as they do so in a knowing and voluntary manner. *See Anderson*, 695 F.3d at 396.

But what qualifies as a knowing and voluntary waiver? The Supreme Court has followed a "right-specific" approach to identify the steps that a district court must take to ensure that a defendant has knowingly and voluntarily waived a right. *See New York v. Hill*, 528 U.S. 110, 114 (2000). For some rights (like the right to stand trial), a district court must ensure a knowing and voluntary waiver on the record. *See United States v. Webb*, 403 F.3d 373, 378–79 (6th Cir. 2005); Fed. R. Crim. P. 11(b)(1). For others (like the right to represent oneself), a defendant may waive the right by engaging in conduct inconsistent with its exercise. *See United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007); *United States v. Ortiz*, 82 F.3d 1066, 1071 (D.C. Cir. 1996). And for still others (like the right to object to evidence), defense counsel may waive the right on the defendant's behalf. *See Hill*, 528 U.S. at 115.

The right to testify falls in the second group. *See Webber*, 208 F.3d at 551. Defendants (not their counsel) must personally waive the right. *See id.* at 550–51. Yet we presume that

defense lawyers have discussed the pros and cons of testifying with their clients. *See id.* at 551. So we also presume that defendants have knowingly declined to testify whenever they raise no objection to counsel's decision not to put them on the stand. *See id.* That is, defendants must place a desire to testify on the record to show that they have not knowingly waived this right through their conduct (their failure to testify). *See id.*; *see also Hodge v. Haeberlin*, 579 F.3d 627, 639–40 (6th Cir. 2009). And unless a defendant objects, the district court need not undertake the type of on-the-record colloquy that it must perform when the defendant pleads guilty and waives the right to a jury trial. *See Stover*, 474 F.3d at 908.

Our presumption of a knowing waiver exists to protect a defendant's right "*not* to testify." *Webber*, 208 F.3d at 552. A rule that required district courts to ask defendants a litany of questions to ensure that they knowingly decided not to testify might pressure them to exercise the right. And defendants might then later allege that the district court's questioning "inappropriately" interfered with their right to remain silent. *See id.*; *see also Yono*, 605 F.3d at 426.

This presumption also applies even when a defendant initially asserts a desire to testify. *See Minor*, 2017 WL 11622729, at *1; *United States v. Campbell*, 86 F. App'x 149, 154 (6th Cir. 2004). If defense counsel later informs the court that the defendant has had a change of heart, the court need not follow up to ensure that the waiver was knowing. *See Minor*, 2017 WL 11622729, at *1. In that event, too, a defendant must object on the record by expressing a continued desire to testify. *See id.*; *see also Ortiz*, 82 F.3d at 1072.

The presumption has teeth. After a bad trial outcome, defendants often assert in post-conviction proceedings that they wanted to testify but that their attorney prohibited them. *See Freeman v. Trombley*, 483 F. App'x 51, 58–59 (6th Cir. 2012); *Hodge*, 579 F.3d at 639. We treat conclusory and belated affidavits of this kind as "inherently unreliable" and "insufficient to rebut" our presumption that a defendant knowingly declined to testify. *Freeman*, 483 F. App'x at 58–59; *see Pagani-Gallego v. United States*, 76 F. App'x 20, 23 (6th Cir. 2003) (order); *Pelzer v. United States*, 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997); *High v. United States*, 1996 WL 742222, at *1 (6th Cir. Dec. 20, 1996). A contrary view would allow a defendant to obtain an evidentiary hearing merely by asserting an "after-the-fact" statement that the defendant wished to

take the stand. *Hodge*, 579 F.3d at 639; *see also United States v. Meacham*, 567 F.3d 1184, 1188 (10th Cir. 2009); *Underwood v. Clark*, 939 F.2d 473, 475–76 (7th Cir. 1991).

These rules doom Carson's claim. To be sure, Carson told Butler that he would like "to testify" on the second-to-last day of trial. Tr., R.102, PageID 1309. Butler dutifully conveyed Carson's request to the court. On the next trial day, though, Butler told the court that Carson no longer wished to testify. This statement sufficed to trigger our presumption that Carson knowingly changed his mind. *See Minor*, 2017 WL 11622729, at *1. And Carson did not place any objection on the record to Butler's statement that he did not want to testify. So he has not overcome our presumption of a knowing waiver. *See id.*; *Webber*, 208 F.3d at 551–52.

Carson's two responses do not change things. Carson first argues that he proposed a "contingent" waiver: he would not testify if he could conduct the closing argument. He thus asserts that the district court's refusal to allow him to perform the closing resuscitated his demand to testify. This argument gets the facts and law wrong. As a factual matter, nothing in the record connects Carson's waiver of the right to testify to his request to perform the closing. Butler told the court that "my client has informed me he does not want to testify, but he wants to do closing arguments." Tr., R.103, PageID 1323. Butler did not tell the court that Carson wanted to remain silent *only if* he could conduct the closing. In fact, after the court denied Carson's request to conduct the closing, it asked: "Any further testimony on behalf of the defense?" *Id.* Butler said: "No, your honor." *Id.* So the one did not depend on the other.

As a legal matter, our cases foreclose Carson's contingent-waiver theory. If a defendant disagrees with a lawyer's statement that the defendant does not wish to testify, the defendant should object to the lawyer's statement on the record. *See Webber*, 208 F.3d at 551. And a defendant who "does not alert" the court of the disagreement waives the right to testify. *Id.* Carson never objected to Butler's repeated statements that Carson did not want to testify.

That conclusion leads to Carson's second response. After the district court denied Butler's motion for a judgment of acquittal, it noted that they were "ready to go." Tr., R.103, PageID 1324. Carson then said that he had "[o]ne issue," but the court directed him to "[t]alk to [his] lawyer." *Id.* According to Carson's after-the-fact affidavit, he planned to "alert" the court

at this time that he objected to Butler's statement that he did not want to testify. *Webber*, 208 F.3d at 551. All the same, Carson never objected on the record—not at that time, not at sentencing, nor at any other point before a final judgment. And the court did not merely bar Carson from speaking. He told Carson to discuss the issue he wanted to raise with his counsel. *Cf. Freeman*, 483 F. App'x at 58. So if Carson did immediately tell Butler that he wanted to testify and Butler refused to notify the court (contrary to what Butler had just done on the prior day of trial), perhaps Carson could have raised an ineffective-assistance claim. Under our caselaw, however, his right-to-testify claim depended on the record's objective statements—not on Carson's uncommunicated beliefs. *See Webber*, 208 F.3d at 551–52. And regardless, Carson's affidavit does not allege that he informed Butler he wanted to testify in response to the court's instruction to speak to his lawyer.

At the least, Carson responds, the district court should have held an evidentiary hearing because of the dispute of fact between Carson and Butler over what they said to each other off the record. Yet Carson's "barebones" claim that Butler would not let him testify does not create a genuine factual dispute over whether he knowingly waived his right to testify. *Underwood*, 939 F.2d at 476; *see Freeman*, 483 F. App'x at 58–59; *Pagani-Gallego*, 76 F. App'x at 23. Under our presumption, Carson's right-to-testify claim instead depends on what he told the court on the record. And because Carson made no contemporaneous objection, he cannot obtain an evidentiary hearing merely by lodging this type of conclusory after-the-fact allegation. *See Hodge*, 579 F.3d at 639; *cf. Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

We affirm.