RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0004p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CLARENCE FRY,

*Petitioner-Appellant,*

*v.*

No. 23-3270

TIMOTHY SHOOP, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:19-cv-02307—Pamela A. Barker, District Judge.

Argued:  December 10, 2024

Decided and Filed:  January 3, 2025

Before:  SUTTON, Chief Judge; SILER and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Adam D. Vincent, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Trane J. Robinson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Adam D. Vincent, Kimberly S. Rigby, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, Sharon A. Hicks, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge.  A jury convicted Clarence Fry of the aggravated felony murder of his girlfriend, Tamela Hardison.  Consistent with the jury's recommendation, an Ohio trial court sentenced him to death.  The Ohio courts affirmed his conviction and sentence on direct

appeal and denied his request for collateral relief.  Fry petitioned for a writ of federal habeas corpus, which the district court denied.  We affirm.

I.

After midnight on July 18, 2005, a heated argument between Clarence Fry and his girlfriend Tamela Hardison got out of hand, prompting Fry to beat up Hardison and to tell her that she was "gonna die tonight."  R.14-1 at 1311.  A neighbor called the police after hearing Hardison "screaming and thumping her feet on the floor and asking for help."  R.14-1 at 1312.  When the officers arrived at their apartment complex, they placed Fry in custody and charged him with aggravated menacing.  At the time, Fry was already on probation for a different crime.  Hardison requested a protective order the same day, and Fry spent the next week in jail.

After the court released Fry on bond, Fry discovered that Hardison had taken some of his belongings.  Fry went to the Akron Police Department to report Hardison's theft.  An officer told him to file a police report and to refrain from visiting Hardison without the police.

Fry took matters into his own hands.  A few days later, on July 31, Fry arrived with a knife at Hardison's daughter's house.  Hardison's five-year-old grandson heard what happened next.  Fry asked Hardison about his belongings, and matters escalated from there.  Fry stabbed her multiple times.  In defense, Fry claimed that he wanted only to recover his property and that he killed Hardison only after she threw an ash tray at him.

The state indicted Fry.  It charged him with aggravated murder in violation of Ohio Revised Code § 2903.01(B).  The indictment came with two death-penalty specifications: murdering Hardison in connection with a felony and killing Hardison to prevent her from testifying in another proceeding.  A jury convicted Fry on both grounds.  The court sentenced him to death.

The Ohio Supreme Court affirmed.  *State v. Fry*, 926 N.E.2d 1239 (Ohio 2010).  The Ohio Court of Appeals denied state collateral relief, *State v. Fry*, No. 26121, 2012 WL 2128027 (Ohio Ct. App. June 13, 2012); *State v. Fry*, No. 28907, 2019 WL 1318562 (Ohio Ct. App. Mar. 20, 2019), and the Ohio Supreme Court declined additional review, *State v. Fry*, 128 N.E.3d 233

(Ohio 2019) (unpublished table decision). Fry filed a habeas petition in federal court, raising 24 grounds for relief. The district court denied his petition and granted a certificate of appealability on five claims: (1) ineffective assistance of trial counsel in declining to urge Fry to testify and in declining to convince him to take a plea deal; (2) ineffective assistance in waiving the right to introduce mitigation evidence; (3) trial-court error in relying on counsel's waiver of Fry's right to testify; (4) trial-court error in accepting the mitigation waiver; and (5) ineffective assistance of appellate counsel for failing to raise the plea-deal claim.

## II.

Because the state court rejected each of these claims on the merits, Fry must meet the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254(d). It requires him to show that the state court decisions "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

## III.

Fry raises three ineffective-assistance-of-counsel claims. To obtain relief, he must show that his counsel performed deficiently and that the deficiency prejudiced the outcome. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When combined with the rigors of AEDPA, that means he must show that there is no "reasonable argument that counsel satisfied *Strickland*'s" test, *Harrington v. Richter*, 562 U.S. 86, 105 (2011), what amounts to a "doubly deferential" obstacle to relief, *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quotation omitted).

## A.

Fry contends that his trial counsel, Laurence Whitney and Kelly O'Brien, provided inadequate assistance during plea bargaining by failing to convince him to take a 30-years-to-life plea deal. The Ohio Court of Appeals, the last state court to review this claim on the merits, rejected it on no-prejudice grounds. The court reasoned that, even if his counsel had pushed him

harder on the weakness of his case and even if they had enlisted family members to try harder to convince him to take the plea, Fry still would not have accepted the plea offer. The record supports the reasonableness of that decision. The trial court gave Fry ample opportunities to take the plea deal and ensured that he voluntarily did not want to take it. The record shows that Fry expressed consistent skepticism of his counsel's recommendations on this front and others. And the record shows that "Fry did *not* want to consult with his family members about his decisions," including the decision whether to put on mitigation evidence, and would not consider their opinions even if he did. R.13-1 at 964. On this record, the state court's no-prejudice ruling represents a reasonable application of law.

Fry resists this conclusion. He invokes the American Bar Association Guidelines, which advise attorneys to "overcome [a] client's natural resistance to the idea of" accepting a guilty plea by contacting "family, friends, clergy and others." ABA Guidelines for the Entry of a Plea of Guilty § 10.9.2 Commentary (2003). But whatever the benefits of these performance recommendations, they do not bear on the prejudice question, the sole ground of the state court's ruling.

Fry insists that his unwillingness to discuss mitigation evidence with his family does not affect whether he would have accepted a plea offer had his counsel performed more ably. Even if a court could interpret the record that way, Fry's reading of the facts is not the only one. When reviewing a state-court habeas determination, we ask only whether a fair-minded jurist could agree with the state court's assessment of the record. *See Burt v. Titlow*, 571 U.S. 12, 20 (2013). A state court could reasonably conclude that a defendant unwilling to consider his family's input about whether to present mitigation evidence likely also would be unwilling to change his mind over their views about whether to accept a plea deal. At most, this shows "fairminded disagreement," not a state-court decision gone awry. *Harrington*, 562 U.S. at 103.

Fry adds that his affidavit to the effect that he would have changed his mind with better advice by counsel, combined with the current disparity between the plea offer and death sentence, demands a finding of prejudice. As support for this proposition, he points to *Griffin v. United States*, 330 F.3d 733 (6th Cir. 2003). *Griffin* does not help him for at least two reasons. It involved a federal, not a state, conviction, and AEDPA applies differently to federal

convictions. And it involved a far more serious prejudice question, as the counsel in that case never told the defendant about the plea offer. 330 F.3d at 739. That's not what happened here.

Fry faults the state court for failing to address a post-conviction affidavit presented by Kenneth Troccoli, a defense attorney who offered his view that Fry's counsel rendered deficient performance that prejudiced Fry. But a "state court need not make detailed findings addressing all the evidence before it." *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003). Once it rules on an issue, a federal court's job is to ask only whether a fairminded jurist could reach the same conclusion. *Shinn v. Kayer*, 592 U.S. 111, 120 (2020) (per curiam). For the reasons just given, the court's no-prejudice decision satisfies this modest burden. No less importantly, the opinion of an expert on a legal question (deficient performance) adds nothing to the inquiry. *Cf. Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (*Strickland* involves questions of law, so "it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing" his counsel's performance was "unreasonable" because these questions are "to be decided by the state courts, by the district court, and by this Court"). At all events, the only ruling that matters here involves prejudice, and this attorney, who had no role in the original trial, is even less qualified to explain what Fry would have done with different representation.

B.

Fry contends that his counsel unreasonably prevented him from taking the stand and overrode his right to testify. *See Rock v. Arkansas*, 483 U.S. 44, 51 (1987). In bringing this claim, Fry must overcome the state court's factfinding that Fry "failed to demonstrate" that his counsel denied him the right to testify. R.13-2 at 1559. That is no mean feat, as AEDPA requires us to give considerable deference to a state court's findings of fact. 28 U.S.C. § 2254(d)(2), (e)(1).

The evidence supports the state court's finding. In two post-conviction evidentiary hearings, the state court carefully considered the issue. During the hearings, Whitney recounted that he and O'Brien both discussed the possibility of testifying with Fry, recognizing that it was "his decision." R.14-2 at 634. Whitney noted that Fry at first wanted to testify, but he changed his mind as the trial progressed and eventually made the "unequivocal" decision not to testify.

R.14-2 at 635. O'Brien described his trial-strategy notes, which showed that Fry initially vacillated about testifying. But, as the trial progressed, O'Brien became "certain" that Fry "did not want to testify." R.14-2 at 692–93. He noted that Fry's "strong personality" ensured that, had "he wanted to testify, he would have said so." R.14-2 at 705. The trial court deemed Whitney and O'Brien, both seasoned criminal-defense lawyers, "extremely credible." R.13-2 at 1467. On top of this, Fry did not object at trial when defense counsel rested without calling him to testify. A defendant must object or indicate a desire to testify if his counsel elects not to put him on the stand. *Carson v. United States*, 88 F.4th 633, 646 (6th Cir. 2023).

The lawyers' account made sense to the state court in view of the several risks to Fry of testifying. Whitney advised against testifying because Fry had proven angry and volatile, which would have become apparent to the jury. During recorded calls to his mother from jail, for example, Fry laughed about the victim, claiming she "got what she deserved." R.14-2 at 647. He also told the arresting officers that he did not "have any remorse for that woman." R.14-2 at 741–42. Had Fry testified, Whitney also feared that the prosecution would introduce evidence about Fry's prior acts of domestic violence against other women and his efforts to burn down one of their homes.

The state court was not moved by Fry's contrary arguments. For example: Fry contended that he made his desire to testify known from the start, and he insisted that he did not know that his last chance "to speak out" passed when Whitney rested the defense's case. R.14-2 at 722. But he also acknowledged that he "should have known" when his time to testify passed, that he "messed up," and that he simply "choked" in failing to say anything. R.14-2 at 722, 737.

The state appellate court ultimately deferred to the trial judge presiding over Fry's post-conviction hearing, who characterized Fry's testimony as "devoid of credibility." R.13-2 at 1494. Fry's "strong-willed and outspoken" attitude during the rest of the trial belied the notion that he forgot to speak out. R.62 at 42. That judge also deemed "largely unhelpful" the testimony of Fry's siblings in support of his story. R.13-2 at 1496. Juxtaposing this testimony with Whitney's and O'Brien's more "credible" account, a fair-minded jurist could agree with the state court that Fry's counsel did not deprive him of his right to testify.

Fry points us to a colloquy at trial between the court and Whitney about his decision to testify. In that discussion, the trial court told Whitney that, "[i]f there was any vacillation" from Fry about testifying, "the Court would ask him on the record" if he wanted to take the stand. R.14-2 at 218. Fry claims that because he—at least at some point—expressed a desire to testify, "there was . . . vacillation," and Whitney misled the trial court by not confirming as much. But the trial court did not ask whether Fry *had ever* vacillated about testifying. It asked about Fry's current stance. Immediately after offering to conduct an on-the-record inquiry in the case of uncertainty, moreover, the trial court asked: "But you are indicating to the Court that [Fry] has decided of his own volition not to testify?" Whitney replied: "That's correct." R.14-2 at 218. Given the focus in both questions on Fry's present state of mind, nothing required the state court to conclude that Whitney lied to the court by omitting Fry's previous interest in testifying. On this record, no reversible error occurred.

## C.

Fry claims that his two lawyers performed ineffectively when they waived his right to present mitigation evidence during the penalty phase. Here, too, the state appellate court adjudicated his claim on the merits, meaning that AEDPA deference applies.

The state court reasonably rejected this claim on no-prejudice grounds—namely, on the ground that Fry would not have presented mitigation evidence even with more forceful arguments by counsel in favor of it. When a defendant knowingly waives his right to present mitigation evidence, that waiver dooms his chance of showing prejudice. *Cowans v. Bagley*, 639 F.3d 241, 249 (6th Cir. 2011). That's just what happened. The state court found that Fry "knowingly and intelligently" directed his counsel to forgo such evidence. Whitney and O'Brien were ready to present testimony from a forensic psychologist, Fry's mother, some of his siblings, and his neighbor. But Fry filed his own pro se motion denying his counsel the chance to participate in his mitigation hearing. As Fry put it, he "expressly forbid[] both of his defense counsel from attempting to participate in any form of mitigation," and said that he did "not wish any family, friends, or professionals to testify on his behalf." R.13-1 at 407. While he ultimately allowed Whitney to make a statement outlining some mitigating factors that came up during the trial, he did not permit anything more and his lawyers respected his wishes.

The trial court's colloquy about Fry's waiver decision, spanning over thirty pages, amply supports the state court's ruling. Fry explained that he wanted to get to the appeals process faster because he was not happy with the jury and saw no reason to "parade [his] family up there" to speak to "the 12 dumbest people" he had "ever seen." R.14-2 at 437, 440. O'Brien told the court that, during their conversations, Fry "was most interested in" the "appellate procedure," R.14-2 at 451, which he claimed to understand.

Fry also addressed the consequences of his choice before he confirmed that he and his counsel had "nothing to say" and demanded the court "[g]as up the bus" and move forward. R.14-2 at 462. When the trial court told Fry that all he needed to do was to persuade one juror against the death penalty, Fry responded firmly: "The hell with them, Your Honor." R.14-2 at 442. When the court asked if he understood the importance of mitigation evidence because "it could literally save your life," Fry responded in no uncertain terms: "With these clowns?" R.14-2 at 446. Elaborating, he said he "understood" that "the use of mitigating evidence offset . . . aggravating circumstances," R.14-2 at 447, and that he knew that, by forgoing mitigation, "these little 12 people" would "probably give [him] the death penalty," and he would have to appeal, R.14-2 at 454. He also rejected the opportunity to make an unsworn statement to the jury. Having knowingly and voluntarily waived his right to present mitigation evidence, the state court could reasonably deny relief on this claim.

Fry's responses boil down to a belief that his counsel should have tried harder. Had Fry's lawyers done what Fry claims they should have—talked about his slim chances of success on appeal, made more efforts to persuade Fry to put on mitigation evidence, explained the death-penalty specifications more fully, or suggested he make an unsworn statement to the jury—Fry claims things would have gone differently. But in the face of Fry's staunch insistence on waiving mitigation evidence, these arguments simply do not satisfy AEDPA's rigorous requirements.

Fry claims in the alternative that his attorney-client relationship had completely broken down, requiring the state court to presume prejudice. *See United States v. Cronic*, 466 U.S. 648, 659 (1984). But *Cronic* applies only when counsel "entirely fails" to subject the case to the adversarial process, *id.*, a collapse in party presentation that must be "imminently clear," *Moss v.*

*Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002). Nothing of the sort happened. Fry's single affidavit merely described "disrespect" and "tension" between Fry and his counsel. R.13-2 at 90. That does not suffice. *Moss*, 286 F.3d at 861. The state court fairly treated this after-the-fact affidavit as "self-serving," R.62 at 42, and reasonably found that Fry was "not denied counsel, constructively or otherwise." R.62 at 59. While Fry may have had a difficult relationship with his counsel, he does not identify a "complete denial of counsel" that caused him to waive his right to present mitigation evidence. *Cronic*, 466 U.S. at 659.

D.

Fry challenges his state appellate counsel's failure to target the allegedly deficient communication of the state's plea offer to him by trial counsel. This claim is procedurally defaulted and thus provides no grounds for relief absent cause and prejudice. *See Coleman v. Thompson*, 501 U.S. 722, 749–53 (1991). The warden, it is true, does not raise procedural default on appeal. But we have discretion to do so ourselves. *See Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000) ("[W]e are not required to review the merits of defaulted claims simply because the Government has failed to raise the issue."). The pertinent Rules of the Ohio Supreme Court required Fry to present claims of ineffective assistance of appellate counsel within 90 days of that court's ruling on direct appeal. Fry took over two years to do so. Then the Ohio Supreme Court denied his application without explanation. Because we assume that state courts, even when silent, enforce applicable procedural bars in denying relief, *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004), we assume the Ohio Supreme Court rejected Fry's petition for lack of timeliness and thus conclude that procedural default bars federal relief.

The claim fails on the merits anyway. To obtain relief, Fry must show that appellate counsel neglected issues "clearly stronger" than those raised. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (quotation omitted). Appellate counsel brought numerous claims on direct appeal. And the state court, on collateral review, rejected Fry's complaint that trial counsel performed inadequately at the plea stage, debunking the notion that this claim is "clearly stronger" than those the state court heard on direct appeal. No error occurred.

IV.

We turn to Fry's two claims of trial court error. The Ohio Supreme Court addressed both of these claims on the merits, requiring Fry to meet the rigors of AEDPA deference.

A.

Fry claims that the trial court violated his right to testify when it failed to ask him independently about that decision. The state court reasonably held that no violation occurred. The first problem with Fry's argument is that he cites no on-point Supreme Court case requiring the trial court to conduct this inquiry. In the absence of such authority, Fry cannot show that the state courts violated clearly established law under AEDPA.

Courts, moreover, presume knowing assent when a defendant tacitly chooses not to testify. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). Absent indication of a desire to testify, the trial court need not "address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify." *Id.*

The testimony of Fry's two trial lawyers supports the state court's rulings. Before the defense began its case, O'Brien (in Fry's presence) told the court "categorically and emphatically that Mr. Fry, the [d]efendant[,] is not going to testify." R.14-2 at 854. Later, Whitney assured the court that he "spent five or six hours" talking to Fry about testifying, and Fry had "not wavered in his opinion that he would not testify." R.14-2 at 631–32.

All the while, Fry never alerted the trial court that he wanted to testify. During the post-conviction hearing, he recognized that he "probably should have" let the court know. R.14-2 at 737. Fry's silence was telling. At other times during trial, he had no difficulty making his feelings known. He chuckled when Hardison's six-year-old grandson testified about seeing the murder, ate candy during the proceedings, made a threatening gesture to someone in the back of the courtroom, and disrupted the courtroom during sentencing until an officer removed him.

B.

Fry contends that the trial court violated his constitutional rights by accepting his mitigation waiver. The state postconviction court held otherwise, and its review of the record

supports its conclusion under AEDPA review. It recounted the trial court's extensive colloquy with Fry about his decision to waive the presentation of mitigation evidence. As noted above, Fry remained steadfast in saying he did not want to present mitigation evidence, and he had no confidence in this jury. We know of no Supreme Court precedent that required the trial court to do more before accepting Fry's waiver. Fry had the right to present mitigation evidence at sentencing, *Payne v. Tennessee*, 501 U.S. 808, 822 (1991), but nothing required him to do so, *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007). Given Fry's unwavering attitude during his colloquy with the court, a fair-minded jurist could agree that no error occurred when the trial court respected Fry's wishes to forgo the presentation of mitigation evidence.

Fry counters that he did not knowingly and voluntarily waive this right because he did not understand the death penalty specifications or his appellate rights. The factual premise of this argument is quite debatable. His statements at trial showed considerable understanding of the stakes and his options on appeal. Either way, the Supreme Court has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce [mitigating] evidence." *Id.* at 479. Even if it had, Fry has not identified Supreme Court precedent requiring that trial courts advise capital defendants on specific legal issues—much less these two specific topics—for a waiver to be knowing and voluntary.

For these reasons, we affirm.